Jack COKER, Appellant,

v.

CRAMER FINANCIAL GROUP, INC., Appellee.

No. 06–98–00072–CV.

Court of Appeals of Texas, Texarkana.

Argued Feb. 24, 1999.

Decided April 14, 1999.

E.L. Atkins, Law Offices of E.L. Atkins, Arlington, for appellant.

Richard D. Worsham, Worsham & Denman, LLP, Bedford, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

Cramer Financial Group, Inc. brought suit against Jack Coker to enforce three promissory notes which Cramer had purchased from the Federal Deposit Insurance Corporation. Both parties appeal from a judgment entered pursuant to a jury verdict finding: that Cramer is the owner and holder of the notes in the aggregate principal balance of $105,514.00; that Cramer is entitled to interest on the notes in the aggregate sum of $6,820.17; that no attorney's fees should be awarded to either side; and that Coker tendered payment of the notes to Walter Overton at a time when Overton was the agent for the holder of the notes.

Coker contends that, based on the jury's finding of tender, Cramer committed usury when it sought interest in its lawsuit against him and that, as a consequence, Cramer forfeited all principal amounts due under the notes. He argues, therefore, that the trial court erred in failing to render judgment that Cramer take nothing and that, as a matter of law, he (Coker) is entitled to damages for double usury, as well as his costs and attorney's fees. Coker also contends that the court erred in overruling his motion to dismiss Cramer's suit because the endorsement of the notes was ineffective to transfer ownership from the FDIC to Cramer.

Cramer contends that there is no evidence of certain legally required elements of tender to support the jury's finding of tender. It also contends there is no evidence supporting the jury's finding that Walter Overton, at the time of the alleged tender or at any time since, was an agent of any owner or holder of the promissory notes. Cramer also contends that, because it is an assignee of the FDIC, Coker's claims for usury and tender are cut off by the *D'Oench, Duhme* doctrine. Cramer further contends there is no evidence supporting the jury's findings of the amount of interest due on each of the three promissory notes and that, in the absence of tender, the findings of interest due are inconsistent with the terms and provisions of the promissory notes. Finally, Cramer argues that there is no evidence supporting the jury's verdict denying attorney's fees to Cramer and that Cramer is entitled to attorney's fees under the terms of the promissory notes as a matter of law.

On December 30, 1988, Coker executed three separate promissory notes to First National Bank of Nocona, Texas. The three notes bore principals of $70,000.00, $10,000.00, and $25,514.28, respectively. The aggregate principal amount was $105,514.28. On each note, the following box was checked: "**Principal:** I agree to pay the principal ON DEMAND, BUT IF NO DEMAND IS MADE THEN ON JULY 1, 1989." Also, on each note Coker agreed to pay interest at the rate of thirteen percent per year and post-maturity interest "at a rate equal to HIGHEST RATE PERMITTED BY LAW." Walter Overton, presi-

dent of Nocona Bank, handled the transactions for the loans.

On April 6, 1989, Nocona Bank was declared insolvent and the FDIC was appointed receiver. Although many of Nocona Bank's assets, including its business premises, were purchased and taken over by First National Bank of Bowie, the FDIC continued to hold the three promissory notes in question in its capacity as receiver.

On July 1, 1989, the three notes matured, and in 1993, Cramer purchased these notes from the FDIC by a loan sale agreement. In 1995, Cramer filed suit against Coker for repayment of the notes, post-maturity interest in the aggregate sum of $160,057.95 for the period from July 2, 1989 through December 2, 1997 (the trial's beginning date), attorney's fees, and costs. Cramer did not seek prematurity interest. Coker filed a motion to dismiss on the ground that Cramer had no standing to assert any claim as pleaded. The trial court denied the motion.

█ In his first two points of error, Coker contends that because the jury found that he tendered full payment of the notes to Walter Overton, whom it found to be an agent of the holder of the notes at that time (the FDIC), he is entitled to judgment on the verdict and Cramer is not. He maintains that it follows from this finding that Cramer, who purchased the notes from the FDIC, committed usury [1] when it sought interest in this lawsuit, knowing that Coker had earlier tendered payment and that, pursuant to Tex. Bus. & Com.Code Ann. § 3.604(a),[2] no interest may be charged after tender occurs. Therefore, he argues that the charging of any interest, i.e., any interest above zero percent, after tender amounts to usury. Coker maintains that Cramer's affidavits and related pleadings in this case seeking such interest amounts to "charging" under Tex. Rev.Civ. Stat. Ann. art. 5069–1.06(1) (Vernon 1987), *repealed by* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602,[3] which reads:

> Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, shall forfeit to the obligor three times the amount of usurious interest contracted for, charged or received, such usurious interest being the amount the total interest contracted for, charged, or received exceeds the amount of interest allowed by law, and reasonable attorney fees fixed by the court except that in no event shall the amount forfeited be less than Two Thousand Dollars or twenty percent of the principal, whichever is the smaller sum; provided, that there shall be no penalty for any usurious interest

1. "Usury" at this time was defined as "interest in excess of the amount allowed by law." Tex.Rev.Civ. Stat. Ann. art. 5069–1.01(d) (Vernon 1987), *repealed by* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602 (now found at Tex. Fin.Code Ann. § 301.001(4) (Vernon 1998), which defines usury substantially the same way).

2. Tex. Bus. & Com.Code Ann. § 3.604 was replaced by Section 3.603, effective January 1, 1996. "An action or proceeding that is commenced or a right that accrues before the effective date of this Act is governed by the law in effect on the date the action or proceeding was commenced or the right accrued, and that law is continued in effect for that purpose." Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 9, 1995 Tex. Gen. Laws 4582, 4643. In the instant case, Cramer filed its original petition in 1995. Section 3.604 (Tender of Payment), effective September 1, 1967, read (in relevant part):

> (a) Any party making tender of full payment to a holder when or after it is due is discharged to the extent of all subsequent liability for interest, costs and attorney's fees.
> (b) The holder's refusal of such tender wholly discharges any party who has a right of recourse against the party making the tender.

Tex. Bus. & Com.Code Ann. § 3.604 (Vernon 1994), *amended by* Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 1, 1995 Tex. Gen. Laws 4582, 4606.

3. Now found at Tex. Fin.Code Ann. §§ 305.001, 305.003 (Vernon 1998).

which results from an accidental and bona fide error.

Further, he argues that because the amount charged by Cramer was more than twice the amount permitted by law (more than twice zero percent), he is also entitled to damages mandated for double usury under Tex.Rev.Civ. Stat. Ann. art. 5069–1.06(2) (Vernon 1987), *repealed by* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602,[4] which read:

> Any person who contracts for, charges or receives interest which is in excess of double the amount of interest allowed by this Subtitle shall forfeit as an additional penalty, all principal as well as interest and all other charges and shall pay reasonable attorney fees set by the court; provided further that any such person violating the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by fine of not more than One Thousand Dollars. Each contract or transaction in violation of this section shall constitute a separate offense punishable hereunder.

Therefore, he argues, he is entitled to the following relief against Cramer: (1) forfeiture of all principal amounts due under the notes; (2) monetary judgment for $480,-173.82, three times the amount of interest charged;[5] (3) attorney's fees of $28,266.72, and (4) court costs.

Coker's argument for tender, upon which his usury and double usury arguments are founded, is based on the following facts. On April 13, 1989, Coker received a letter from Bowie Bank telling him that it had purchased from the FDIC all the depository liabilities of Nocona Bank and would operate the former Nocona Bank as its branch bank. Further, the letter stated, "Payments on loans should be made to the bank as scheduled." Coker testified that in May 1989 he tendered full payment of the three notes to Walter Overton at Bowie Bank. He maintains that, although he did not tender payment to the actual holder of the notes (the FDIC), he did tender payment to Overton, who was acting as an agent for the FDIC.

██ Cramer responds that Coker is not entitled to judgment on the verdict because his defenses of tender and usury are barred by the doctrine of *D'Oench, Duhme*. See *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). This doctrine, codified in 1950, is found in 12 U.S.C.A. § 1823(e).[6] Under the *D'Oench, Duhme* doctrine, no agreement that tends to diminish the interest of a financial institution under federal receivership is valid unless: (1) it is in writing; (2) it was contemporaneously executed by the depository institution and the person claiming the adverse interest; (3) it was approved by the board of directors or loan commit-

---

4. Now found at Tex. Fin.Code Ann. §§ 305.002–.003, 305.005 (Vernon 1998).

5. The aggregate amount of interest sought by Cramer, trebled, would actually be $480,-173.85.

6. 12 U.S.C.A. § 1823(e) (West Supp.1999) reads (in relevant part):

> **(1) In general**
> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
> **(A)** is in writing,

> **(B)** was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
> **(C)** was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
> **(D)** has been, continuously, from the time of its execution, an official record of the depository institution.

tee; and (4) from the time of its execution it has been continuously a record of the financial institution. *Bluebonnet Sav. Bank v. Jones Country, Inc.*, 911 S.W.2d 871, 873 (Tex.App.-Beaumont 1995), *rev'd on other grounds*, 920 S.W.2d 670 (Tex. 1996). The doctrine prevents a person who has dealt with a failed institution from relying on unwritten agreements with the bank as a defense to the enforcement of a facially valid obligation. *Commonwealth Land Title Ins. Co. v. Nelson*, 889 S.W.2d 312, 319 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

The United States Supreme Court has announced that this doctrine serves three purposes: (1) it allows federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets without being concerned that an asset of the bank is encumbered by some unrecorded agreement; (2) it ensures mature consideration of unusual loan transactions by senior bank officials; and (3) it prevents the fraudulent insertion of new terms, with the collusion of the bank employees, when a bank appears headed for failure. *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 98 L.Ed.2d 340, 347 (1987).

■ Where applicable, the federal doctrine of *D'Oench, Duhme* and Section 1823(e) each preempts state commercial law. *See Federal Deposit Ins. Corp. v. Plato*, 981 F.2d 852, 857 n. 10 (5th Cir. 1993) (citing *D'Oench, Duhme & Co.*, 315 U.S. at 473–74, 86 L.Ed. at 970–71 (Jackson, J., concurring)). Although identical results are often obtained under either one, the FDIC may rely on the *D'Oench, Duhme* doctrine, Section 1823(e), or both. *Commonwealth Land Title Ins. Co.*, 889 S.W.2d at 320. However, the protections of the *D'Oench, Duhme* doctrine do not end with the FDIC; they extend to the assignee of the FDIC as well. *McDonald v. Foster Mortgage Corp.*, 834 S.W.2d 573, 576 (Tex.App.-Houston [14th Dist.] 1992, writ denied); *Jones v. Resolution Trust Corp.*, 828 S.W.2d 821, 822–23 (Tex.App.-

Fort Worth 1992, writ denied); *NCNB Texas Nat'l Bank v. Campise*, 788 S.W.2d 115, 118–19 (Tex.App.-Houston [14th Dist.] 1990, writ denied).

■ In the instant case, despite the fact that Cramer argued in its pleadings that the *D'Oench, Duhme* doctrine barred Coker's affirmative defense of tender of payment, the trial court permitted Coker to present his tender defense at trial. It should be noted, however, that a trial court's conclusions of law are given no particular deference by an appellate court. *Pulido v. Dennis*, 888 S.W.2d 518, 520 (Tex.App.-El Paso 1994, no writ); *Sears, Roebuck and Co. v. Nichols*, 819 S.W.2d 900, 903 (Tex.App.-Houston [14th Dist.] 1991, writ denied). An appellate court has the power and the duty to independently evaluate the legal determinations of the trial court. *Pulido*, 888 S.W.2d at 520.

Although the *D'Oench, Duhme* doctrine originated as a protection for the FDIC against oral agreements between a failed bank and a borrower, the extent of its protection has been expanded. *See Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013, 1015 (5th Cir.1990); *Kilpatrick v. Riddle*, 907 F.2d 1523, 1527 (5th Cir.1990); *Commonwealth Land Title Ins. Co.*, 889 S.W.2d at 320. As stated in *Bowen*, 915 F.2d at 1015–16:

> The modern *D'Oench* rule protects the FDIC, as receiver of a failed bank or as purchaser of its assets, from a borrower who has "'lent himself to a scheme or arrangement' whereby banking authorities are likely to be misled." ... In particular, *D'Oench* bars the use of unrecorded agreements between the borrower and the bank as the basis for defenses or claims against the FDIC.... Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either.

In *Stiles v. Resolution Trust Corp.*, the Dallas Court of Appeals held that the defense of *payment* was barred by the

*D'Oench, Duhme* doctrine. *Stiles v. Resolution Trust Corp.*, 831 S.W.2d 24, 28 (Tex. App.-Dallas 1992), *rev'd on other grounds*, 867 S.W.2d 24 (Tex.1993). In that case, a lender brought suit on a promissory note. Later, the Resolution Trust Corporation (RTC) was appointed receiver for the lender and intervened in the suit. The borrower defended on, among other grounds, the ground of payment of the note. The court of appeals affirmed the trial court's granting of summary judgment for the RTC and held that the *D'Oench, Duhme* doctrine and 12 U.S.C.A. § 1823(e) barred the affirmative defense of payment. It reasoned that because this defense would defeat the RTC's right, title, or interest in the note, it is invalid against the RTC "unless all of the requirements of section 1823(e) are met." *Id.* This Court recently ruled that the *D'Oench, Duhme* doctrine and 12 U.S.C.A. § 1823(e) barred the affirmative defense of payment. *See Pierson v. SMS Financial II, L.L.C.*, 959 S.W.2d 343, 350 (Tex.App.-Texarkana 1998, no pet.).

Here, Cramer Financial Group claims the right to enforce the notes as owner and assignee of the FDIC. Coker's defense to enforcement of the notes against him is not that he made payment, but that he attempted to do so, i.e., that he tendered full payment and it was rejected. It appears that the reasoning and logic of the case law dealing with payment as a defense would also apply to *tender* of payment as a defense. If full and executed payment of a note is barred as a defense to its enforcement by the *D'Oench, Duhme* doctrine because it is not documented and would tend to defeat the FDIC/RTC's right, title, or interest in a note, then so would an undocumented tender of payment be barred as well. Tender of payment, like full payment, would also serve to defeat the FDIC/RTC's right, title, or interest in a note.

However, we find that the *D'Oench, Duhme* doctrine does not apply to these facts. Here, the alleged tender occurred not before the FDIC took over as receiver for Nocona Bank on April 6, 1989, but after it did so—allegedly in May of 1989— and before the FDIC sold the three notes to Cramer on October 1, 1993. The jury found that Coker's tender of payment was not to the failed institution which the FDIC subsequently took over, but to an agent (Walter Overton) of the FDIC itself. The purpose of the *D'Oench, Duhme* doctrine is to prevent a person who has dealt with a failed institution from relying on unwritten agreements with that institution as a defense to the enforcement of a facially valid obligation. Here, that purpose is not implicated. However, because we sustain Cramer's contention that there is no evidence supporting the jury's finding that Walter Overton, at the time of the alleged tender or at any time since, was an agent of any owner or holder of the promissory notes (discussed below), we overrule Coker's points of error in reliance on the jury's finding in support of his affirmative defense of tender.

■ In his third point of error, Coker contends that the trial court erred in overruling his amended motion to dismiss Cramer's suit against him. He argues that the negotiation of the notes from the FDIC to Cramer was defective pursuant to TEX. BUS. & COM.CODE ANN. § 3.201 (Vernon Supp.1999) (Negotiation) and TEX. BUS. & COM.CODE ANN. § 3.407 (Vernon Supp.1999) (Alteration) and, therefore, was ineffective to transfer ownership to Cramer. As a result, he says, Cramer does not have standing to bring suit on the notes and, correspondingly, the trial court does not have subject matter jurisdiction to entertain this suit because a party's standing is a component of subject matter jurisdiction. Specifically, he argues that the endorsement of the notes from the FDIC to Cramer was not a proper endorsement. The basis of his argument is the fact that the FDIC's endorsement on the notes assigns all right, title, and interest to "CFG, Inc." A line is then drawn from "CFG, Inc." to an area above the endorsement at

which is written, "Cramer Financial Group, Inc." Further, to the left of the endorsement is written:

ENDORSEMENT

CANCELLED

BY: *[signature]*

Attorney–in–Fact

for the FDIC

Cramer maintains that the notes were endorsed to "CFG, Inc." before delivery and were altered by the FDIC for purposes of clarification at the closing in October 1993. The words "Cramer Financial Group, Inc." were handwritten above the endorsement and a line was drawn from "CFG, Inc." to the newly written words. When, in the course of this litigation, Coker objected to the nature of this correction, Cramer had the FDIC cancel the endorsement and re-endorse the notes to "Cramer Financial Group, Inc."

As Cramer noted in its response to Coker's motion to dismiss, the Texas Rules of Civil Procedure do not authorize a motion to dismiss when there is a contested issue which requires findings of fact and conclusions of law. However, the character of a motion is judged by its substance rather than its form or caption. TEX.R. CIV. P. 71.[7] Here, Coker's motion to dismiss is in essence a motion for summary judgment because it asks the trial court to summarily rule that, as a matter of law, Cramer has no claim or right to enforce the notes. Generally, with few exceptions, the denial of a motion for summary judgment is not reviewable on appeal because it is not a final judgment. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996); *see Shepherd v. Ledford,* 926 S.W.2d 405, 408 (Tex.App.-Fort Worth 1996), *aff'd,* 962 S.W.2d 28 (Tex.1998). None of the exceptions apply in the instant case. We hold

that the trial court did not err in overruling Coker's motion to dismiss.

■ We now turn to Cramer's contention that there is no evidence to support the jury's finding that Walter Overton, at the time of the alleged tender, was an *agent of the owner or holder of the promissory notes.* As stated previously, Coker's affirmative defense of tender is based upon the argument that, although he did not make tender to the actual holder of the notes as set forth in TEX. BUS. & COM.CODE ANN. § 3.604,[8] he did make tender to an agent of the holder of the notes. Coker argues that the jury charge's definition of "agent" was broad enough to encompass all types of agency, including ostensible agency and apparent agency.

■ A no evidence challenge may be sustained only when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; (4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990); *Spiers v. Maples,* 970 S.W.2d 166, 170 (Tex.App.-Fort Worth 1998, no pet.). In reviewing a no evidence point, the reviewing court considers only the evidence and inferences that tend to support the finding and disregards all evidence to the contrary. *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 666; *Spiers,* 970 S.W.2d at 170. If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law; there is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach dif-

---

7. See *State Bar of Texas v. Heard,* 603 S.W.2d 829, 833 (Tex.1980); *Messmer v. State Farm County Mut. Ins. Co.,* 972 S.W.2d 774, 777 (Tex.App.-Corpus Christi 1998, no pet.); *Toubaniaris v. American Bureau of Shipping,* 916 S.W.2d 21, 23 (Tex.App.-Houston [1st Dist.] 1995, no writ).

8. Now found at TEX. BUS. & COM.CODE ANN. § 3.603.

ferent conclusions about the existence of the vital fact. *Spiers,* 970 S.W.2d at 170.

Here, the jury charge submitted the following definitions:

1. An **Agent** is a person who has a legal relation, founded on the express or implied contract of the parties or created by operation of law by virtue of which one party, the **Agent,** is authorized to act for the other party, who is the principal. More specifically, an **Agent** is one who is authorized by another to transact business or manage some affair for him, and to render to him an accounting of such transaction.

. . . .

4. **Holder** is a person who is in possession of an instrument drawn, issued, or indorsed to that person, to his order, bearer, or in blank.

. . . .

15. **Tender** is an unconditional offer to pay a sum of money not less than the amount due on the obligation. **Tender** must include everything the creditor is entitled to; any less sum is ineffectual.

Jury Question Number 13 asked:

If Jack Coker tendered payment of the Promissory Notes to Walter Overton, was Walter Overton at that time an agent for the Holder of the Promissory Notes?

The jury answered "Yes" to this question.

The evidence in the record is legally insufficient to support the jury's answer to Question Number 13. Although the jury was not asked to specify exactly who the "holder" of the notes was at the time of the alleged tender, there can be only one answer: the FDIC. At this time, Nocona Bank was under the federal receivership of the FDIC because it was insolvent, and it was the FDIC which transferred the notes to Cramer in 1993. There is no evidence in the record that Overton acted individually as an agent for the FDIC. In fact, Overton's testimony directly refutes this idea. He testified as follows:

Q. [from Coker's counsel] Okay. Do you recall in May, during the period of May and June of 1989, Mr. Coker coming in to see you personally in the bank requesting the—that he—his right to pay these notes in full?

A. I don't recall that.

Q. Okay. If he had come in to—to pay the notes in full, either in May or June, in light of your earlier testimony of the bank failure sometime in April, what would have been your response to him?

A. We would have had to in this case determine that it was the FDIC that had control of his assets and his loans, and that he would have to discuss that with the FDIC.

. . . .

A. It would not have been one of our [Bowie Bank's] assets, so we would have had to refer them to someone in the FDIC.

Based on the definition of agent given, certainly Walter Overton was the agent of Bowie Bank, his employer, at the time of the alleged tender. However, there is no evidence that Bowie Bank acted as an agent for the FDIC. There is no evidence of actual authority. Actual authority includes both express and implied authority and usually denotes the authority which a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses. *Sociedad De Solaridad Social "El Estillero" v. J.S. McManus Produce Co.,* 964 S.W.2d 332, 334 (Tex. App.-Corpus Christi 1998, no pet.). Here, there is no evidence that the FDIC intentionally conferred authority upon Bowie Bank to act as its agent, intentionally allowed Bowie Bank to believe it possessed authority to act as an agent for the FDIC, or by lack of due care allowed Bowie Bank to believe it possessed authority to act for the FDIC. Further, given the language of

the jury instruction, there is no evidence that the FDIC expressly or impliedly contracted with Bowie Bank so as to authorize Bowie Bank to transact business or manage some affair for it. Also, there is no evidence that Bowie Bank was under an obligation to render an account to the FDIC of any business it might have transacted on the FDIC's behalf.

Also, there is no evidence of ostensible agency.[9] Ostensible agency applies in circumstances where the principal's conduct should equitably prevent it from denying the existence of an agency and is based on the notion of estoppel, that is, a representation by the principal causing justifiable reliance and resulting harm. *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947–48 (Tex.1998). A party asserting ostensible agency must demonstrate that (1) the principal, by its conduct, (2) caused him to reasonably believe that the putative agent was an employee or agent of the principal, and (3) that he justifiably relied on the appearance of agency. *Id.* at 948; *see also Sociedad De Solaridad "El Estillero,"* 964 S.W.2d at 334–35 (setting forth the elements of apparent authority). Coker may have had a subjective, good faith belief that he was dealing with an agent of the FDIC, but this is not enough to create an agency relationship. If this were the case, one party could easily bind another party by claiming to have dealt with the other party's agent even if the legal elements of agency were not met. Coker produced no evidence of conduct by the FDIC that would lead Coker to reasonably believe that Bowie Bank was the agent of the FDIC. Bowie Bank took over the building formerly used by Nocona Bank, and Walter Overton took a job with Bowie Bank at that very location, but this goes more to confusing the identity of Bowie Bank with Nocona Bank, not to confusing Bowie Bank with the FDIC.

In support of his claim of ostensible agency between Bowie Bank and the FDIC, Coker points to the letters that Bowie Bank unilaterally sent out to people who formerly had dealings with Nocona Bank telling them that Bowie Bank had purchased all of the depository liabilities of Nocona Bank from the FDIC and would operate the old Nocona Bank as its branch bank. This in no way indicates that Bowie Bank had authority to transact business for the FDIC. To the contrary, it shows that Bowie Bank is independent of the FDIC and purchased these assets from the FDIC. Further, there is evidence supporting the fact that, prior to maturity of the notes, Coker knew that the FDIC, not Bowie Bank, held his notes, and that he had not received any other correspondence, besides the letter from Bowie Bank, that his notes had been transferred to Bowie Bank. Coker testified as follows:

> Q. And when you went in to try to pay it the third week in May and Mr. Overton put you off for five weeks, did you realize that interest was continuing to accrue at that time?
>
> A. Sure I did. I'm a better business person than that.
>
> . . . .
>
> Q. And did you protest this in any way?
>
> A. I talked with Walter about it.
>
> Q. And he told you he couldn't accept the payment?
>
> A. That's exactly right.
>
> Q. And did he explain to you why he couldn't accept the payment?
>
> A. He just told me that the way things was right then he had to get some more stuff together.

**9.** "Many courts use the terms ostensible agency, apparent agency, apparent authority, and agency by estoppel interchangeably. As a practical matter, there is no distinction among them.... Regardless of the term used, the purpose of the doctrine is to prevent injustice and protect those who have been misled." *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 n. 2 (Tex.1998).

Q. So it wasn't until the last week in June that you were told that they belonged to the FDIC?

A. The fifth trip I made, that's exactly what Mr. Ken Henry told me.

Q. Other than that letter, Defense Exhibit No. 4, do you have any other evidence, any other documentation, showing that your notes were transferred and assigned to the First National Bank of Bowie at any time?

A. Was transferred to the Bowie Bank?

Q. Yes.

A. No, I do not.

Because there is no more than a scintilla of evidence that Walter Overton acted as agent for the holder of the notes when Coker made tender of payment, and because there is uncontroverted evidence that the FDIC held the notes at this time and was the proper entity to receive tender of payment, we hold that the evidence is legally insufficient to support the jury's finding that Overton was acting as agent for the holder of the notes when Coker tendered payment. We sustain Cramer's challenge on this basis. Further, because we sustain this point of error, we find it unnecessary to address Cramer's challenge that there is no evidence supporting all the legally required elements of tender.

Because we find that Coker did not tender payment to the holder of the notes as required by TEX. BUS. & COM.CODE ANN. § 3.604,[10] his affirmative defense of tender fails. Because his claims for usury and double usury are based upon the viability of his tender defense, his usury claims also fail.

Cramer further contends there is no evidence to support the jury's findings of the amount of interest due on each of the three promissory notes, and in the absence of tender, the findings of interest due are inconsistent with the terms and provisions of the promissory notes. We find that because of the failure of Coker's tender defense, the evidence is insufficient to support the jury's finding as to the amount of interest due on each of the three promissory notes. Therefore, we hold that Coker is liable for the accrual of post-maturity interest on the three notes according to the terms of the notes at the highest rate permitted by law. Coker made no specific challenge to Cramer's representation that Texas law set that "highest rate" at no less than eighteen percent[11] or to the testimony of Cramer's employee, Roger Green, that applying this rate for the period of July 2, 1989 to December 2, 1997 (the date of trial), the aggregate amount of post-maturity interest accrued was $160,057.95.

■ Cramer finally contends there is no evidence to support the jury's verdict denying him attorney's fees. This is an issue upon which Cramer had the burden of proof. When examining the legal sufficiency of the evidence to support a finding on which the appellant had the burden of proof, the appellate court first examines the record for evidence to support the jury's answers and ignores all evidence to the contrary. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence, the reviewing court then examines the entire record to determine if the contrary proposition is established as a matter of law. *Id.* When evaluating assertions that a jury's finding is against the great weight and preponderance of the evidence, the appellate court weighs all of the evidence and sets aside the jury's adverse finding only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

10. Now found at TEX. BUS. & COM.CODE ANN. § 3.603.

11. See TEX.REV.CIV. STAT. ANN. art. 5069–1.04(b)(1) (Vernon 1987), *repealed by* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602 (now found at TEX. FIN.CODE ANN. §§ 303.304, 303.305 (Vernon 1998)).

An award of attorney's fees to a plaintiff recovering on a valid claim founded on a written or oral contract, preceded by proper presentment, is mandatory. *Whitehead v. State Farm Mut. Auto. Ins. Co.*, 952 S.W.2d 79, 89 (Tex.App.-Texarkana 1997, no pet.) (opinion on reh'g); *Arguelles v. Kaplan*, 736 S.W.2d 782, 786 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.); *see* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). Coker argued at trial and contends on appeal that he does not owe attorney's fees because of his tender of payment defense. However, because we have determined that Coker's defense of tender fails as a matter of law, and because his evidence on this defense is the only evidence that supports the jury's finding, we hold that the evidence is legally insufficient to support the jury's finding denying attorney's fees to Cramer. Further, after examining the entire record, we find that the contrary proposition is established as a matter of law: that Cramer is entitled to an award of attorney's fees in the total sum of $9,773.21.[12]

In summary, we reverse the judgment awarding interest as found by the jury and reform the judgment, deleting such award, and providing that Cramer recover from Coker post-maturity interest in the aggregate sum of $160,057.95. We further reform the judgment to include recovery of attorney's fees to Cramer from Coker in the amount of $9,773.21. In all other respects, the judgment of the trial court, as reformed, is affirmed.

---

**12.** While Coker vigorously contested the necessity for attorney's fees for Cramer in *any* amount, he did not attack or contradict the reasonableness of this total figure.